Filed 6/9/21; Opinion following rehearing

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br><br>KAWAN HASIMRASHID HARDY,<br>        Defendant and Appellant. | A158179<br><br>(Alameda County Super.<br> Ct. No. 18CR015233) |

Defendant Kawan Hasimrashid Hardy was convicted after a jury trial and sentenced to 19 years and 8 months in prison on five criminal counts for firing a semi-automatic pistol in the direction of an occupied vehicle while standing in the street on 90th Avenue in Oakland, California one evening in September 2018. An Oakland Police Department undercover officer observed Hardy firing a handgun of some kind, which was corroborated by a liquor store's surveillance video and other evidence.

Most of Hardy's sentence was based on his conviction for assault with a semi-automatic firearm, count 5, it having been designated the principal term among multiple counts. The strongest, and only unambiguous, evidence that the firearm he fired was a semi-automatic was an audio recording that

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion parts II and III.

had been sent to the Oakland Police Department by a third-party service called "Shotspotter."

In the published part of this opinion, we conclude the trial court erred in admitting the Shotspotter evidence without first conducting an evidentiary hearing to assess its scientific reliability pursuant to *People v. Kelly* (1976) 17 Cal.3d 24, which in turn relied on *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (collectively *Kelly*/*Frye*).[1]  We further conclude the error was prejudicial and therefore reverse Hardy's conviction on count 5, but authorize the trial court to reinstate that conviction on remand after conducting a *Kelly*/*Frye* hearing if the court concludes the Shotspotter evidence was admissible at trial.

In the unpublished parts of this opinion, we discuss Hardy's other arguments for reversal of his conviction for count 5, and also for reversal of his conviction for count 1, the willful and malicious discharge of a firearm at an occupied vehicle.  First, Hardy contends that the preliminary hearing magistrate committed prejudicial error by improperly barring defense counsel's cross-examination of the undercover officer about the officer's location at the time he observed Hardy fire the weapon, which the magistrate ordered under Evidence Code section 352 after the officer claimed an official privilege under Evidence Code section 1040 to withhold the information.  We conclude that, assuming error for the sake of argument, it was harmless.  Hardy also argues the trial court committed instructional error in responding

_____

[1]  In *People v. Cowan* (2010) 50 Cal.4th 401, our Supreme Court noted that, while *Kelly* relied on *Frye*, it has become more appropriate to refer to *Kelly* alone because the United States Supreme Court has ruled that the Federal Rules of Evidence superseded *Frye*.  (*Cowan*, at p. 469, fn. 22.)  We refer here to the "*Kelly/Frye*" rule because that is the designation used below and in this appeal by the parties.

to a jury question during deliberations about this count. We conclude this claim lacks merit.

After we issued our original opinion, the People filed a petition for rehearing on multiple subjects. We initially denied the petition but modified the disposition in our original opinion. Hardy objected to the modification, and we then withdrew our order denying the petition and granted rehearing for the limited purpose of considering the parties' additional arguments regarding the disposition issues. This opinion is substantively the same as our original opinion except in two respects. First, upon considering the parties' additional arguments, we conclude our modification to the disposition is appropriate and reinstate it at the conclusion of this opinion. Second, because our modified disposition authorizes the trial court to reinstate the count 5 conviction if the court concludes after conducting a *Kelly/Frye* hearing that the Shotspotter evidence was admissible at trial, we also discuss the proceedings related to, and the merits of, Hardy's two other arguments for reversal of his count 5 conviction, which we did not consider in our original opinion. These arguments are essentially the same as Hardy's arguments regarding count 1. As we have already indicated, we conclude that neither argument provides a basis for reversal.

## BACKGROUND

In October 2018, after the Alameda County District Attorney filed an amended criminal complaint against Hardy regarding the September 2018 shooting incident, and after a preliminary hearing, the magistrate ordered that Hardy be held over on certain charges. Consistent with the magistrate's ruling, the district attorney filed an information charging Hardy with four felony counts: discharge of a firearm at an occupied motor vehicle (Pen. Code,

3

§ 246; count 1[2]), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), carrying a loaded firearm in a city (§ 25850, subd. (a); count 3), and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 4). On the first day of trial, the court allowed the prosecution, over a defense objection, to file an amended information that added count 5, which alleged Hardy had also committed an assault with a semi-automatic firearm in violation of section 245, subdivision (b), with an enhancement for personal use of a firearm under section 12022.5, subdivision (a).

At trial, evidence was presented that on the evening of September 14, 2018, members of the Oakland Police Department's Crime Reduction Team (CRT) engaged in undercover surveillance of the area around Booker's Liquor Store (store), which was located at the corner of 90th Avenue and Olive Street in Oakland. About 20 people were gathered in the store's parking lot, which abutted both 90th and Olive, for the making of a music video. Undercover officer Gregory Rosin was the "point officer" with the best view of the scene, and Officer Joseph Coleman was the supplemental undercover officer positioned a little further away. The surveillance operation began at about 7:30 p.m.

Officer Rosin was the prosecution's principal trial witness against Hardy. Rosin testified that he surveilled the scene from inside a parked car on 90th Avenue across the street from the store, using his eyesight alone and binoculars. His vantage point allowed him to "watch[] what was happening in front of me and to the sides of me" and gave him "a clear and unobstructed view of this scene." He could see the store's parking lot, the store building, traffic passing him on 90th Avenue and traffic going up and down on Olive

---

[2] All further statutory references are to the Penal Code unless otherwise stated.

4

Street up to a little past the store's driveway. He was in radio communication with Officer Coleman and several uniformed CRT members, the latter being located in marked patrol vehicles a few blocks away.

During the surveillance, Officer Rosin recognized from previous contacts Hardy and two others, DeMarcus Wilson and David Grant, in the area of the parking lot. Hardy was wearing a black hooded sweatshirt and distinctive black pants with white stripes running down the sides. Wilson was wearing a red hooded sweatshirt, and Grant was wearing a white T-shirt. At about 8:20 p.m., Rosin noticed Hardy, Grant, and Wilson separate themselves from the larger group in and around the parking lot of the store and walk to the corner of Olive and 90th Avenue. He had a clear and unobstructed view of the three from about 45 to 50 feet away. They remained at the corner for four or five minutes, walked back towards an Isuzu Rodeo parked near the store's entrance, and returned to the corner about two to three minutes after that. They stood on 90th Avenue, a four-lane street (with two lanes running in each direction) that had a stop sign just past the Olive Street intersection. Officer Rosin watched Wilson closely because he believed Wilson was armed based on bulges in his clothing and his movements.

A short time later, a white sedan traveling north on 90th Avenue drove by in the "number two" lane, the lane closest to where Hardy stood. Hardy "sprinted" into the "number two" lane looking north, crouched over, slowed his pace, took a "handgun" out of his clothing, extended it "out towards the white car" and began firing it "immediately after" the white car had passed him, meaning "one to three seconds" afterwards. He went 10 to 15 feet into 90th Avenue, and also advanced north 10 to 15 feet on 90th Avenue. Officer Rosin saw the gun's muzzle flash and heard "six or seven" shots. The record

5

contains no evidence that anyone was hit by the shots, or that any property damage resulted from them.

Officer Rosin could not see the firearm that Hardy used. He acknowledged that revolvers make a muzzle flash when fired. Nonetheless, he testified he knew Hardy fired a semi-automatic weapon because Hardy fired "six or seven" shots and a revolver could only fire "five or six" shots, and because Rosin saw bullet casings on the ground after Hardy left, which he directed officers to collect. Rosin recalled that he saw the spent casings lying in the street, and on the grassy and paved areas of the sidewalk.

The record—meaning photographs and testimony by an Oakland Police Department evidence technician—indicates that investigating police recovered six .380-caliber bullet shell casings on the grassy and paved areas of the sidewalk, at the corner of 90th and Olive, but not in the street. The street was searched and no casings were found there. Police also seized a firearm from the Isuzu parked by the liquor store. An Oakland Police Department laboratory report admitted into evidence refers to the spent casings found on the sidewalk as "six fired 380 Auto caliber cartridge cases" that "have the same class of firearm produced marks and sufficient corresponding individual microscopic marks to conclude that they were all fired by the same firearm." The report further concludes, and the parties stipulated, that these casings were not fired from the semi-automatic weapon seized from the Isuzu.

Two Oakland police officers, Officer Coleman and Officer Patrick Airoso, also testified, both as lay persons based on their own extensive experience, about semi-automatic pistols and revolvers. Officer Coleman testified that spent casings are automatically ejected from semi-automatic pistols, in his experience always from the right side, whereas spent casings

6

must be manually removed from revolvers.  Officer Airoso testified that for right-handed semi-automatic pistols, spent casings are automatically ejected to the right and for left-handed semi-automatic pistols, spent casings are automatically ejected to the left.

Officer Coleman was shown the six bullet shell casings found at the scene and asked if by looking at them he was able to tell the type of weapon they were fired from.  He said it was "hard to read," but "you could tell based on the size and the print on the back what size bullet they are.  And so what size the gun was chambered for.  You can also tell—you'll be able to see what are called ejector marks.  Those are when a semi-automatic pistol cycles through, there's actually a metal piece called an ejector that basically shoots out the spent casing.  It catches it and shoots it out.  So these will have a mark that's indicative of that."  Also, he explained that "a semi-automatic would eject the spent casings, which then, unless the person who fires the weapon . . . picks them up, are going to be left on the scene.  That's one of the biggest pieces of evidence a semi-automatic will leave behind.  It doesn't mean the revolver won't leave that behind.  It just means the person would have to reload the revolver and dump the casings there."  Coleman testified that he had fired "[a] dozen, two dozen" semi-automatic pistols, and that all of them ejected casings three to ten feet from a port on the right side of the weapon, and that none had ejected casings from the left side.

As for the events around the shooting, Officer Rosin further testified that, when the shooting started, Grant started walking down Olive Street towards the main group in and around the store's parking lot, while Wilson ran behind Hardy, removed a handgun from his waist and pointed it in the same direction as Hardy but did not shoot.  After the shooting, Hardy and Wilson also walked back towards the main group.  Wilson joined the group,

7

but Hardy and Grant passed the group, continuing to walk down Olive towards 92nd Avenue, and were soon out of Officer Rosin's view.

Officer Rosin further testified that he radioed the other officers to tell them Hardy had fired a gun at someone. Rosin described Hardy's clothes and said he believed Wilson was also armed. Then, he said, within 10 to 20 seconds of observing Hardy fire the shots, he received a Shotspotter phone notification and audio recording informing him that shots were just fired at his location. Rosin testified that the recording, which he listened to at the scene, was "consistent" with what he observed.

As we will discuss, Shotspotter is a service used by the Oakland Police Department that sends officers notifications and audio recordings of sounds the service has identified as gunshots detected in certain areas of Oakland. The prosecution played the Shotspotter audio recording for the jury during Officer Rosin's testimony and at the beginning of closing argument. It consists of seven distinct percussive sounds, one right after the other, which were purportedly recorded at the time when, and the place where, Officer Rosin observed Hardy fire.

Surveillance footage taken from the liquor store, which was magnified and without sound, was shown to Officer Rosin. He testified that the car in which he was sitting that night could be seen on the video, and he pointed out a white car. The video shows this white car parked across 90th Avenue, directly opposite the corner of 90th Avenue and Olive. The video also shows an individual wearing black pants with white stripes walk over to that corner with two others and shows the three then standing there together for about two minutes. A white sedan travelling north can be seen passing the three individuals on 90th Avenue in the lane nearest where the three were standing. The sedan slows to a near stop (around where Rosin testified there

8

was a stop sign) and continues on as the individual in the striped pants hurries into the street, moving in the same direction as the sedan that has just passed by him and into an area of the video frame where he is partially obscured.  Two flashes, one immediately after the other, appear just to his right, about head high.  As soon as he hurries into the street, one of the other two individuals starts walking down Olive Street, followed a few moments later by the other, who is followed a few moments later by the person wearing the white striped pants.  The three return to the area of the store parking lot, where the larger group is gathered.  One of them joins the group, while the person wearing the white striped pants and the other individual continue walking down Olive Street until they are out of the video's lower right frame.  A little more than four minutes later, the person wearing the white striped pants can be seen returning to the area of the store parking lot after apparently walking back up Olive Street.

Officer Coleman testified that on the night of the incident he was surveilling the area from a vehicle on Olive Street about a block away.  He could not see all the way up to the corner of 90th and Olive, but he heard "around" six gunshots just before 8:30 p.m.  He then heard Officer Rosin report that Hardy had shot at a passing vehicle and saw Hardy, Wilson and Grant, whom he recognized from previous contacts, walking quickly eastbound on Olive Street.  Wilson stayed near an area of the liquor store parking lot that was on Olive some distance down from 90th Avenue (the surveillance video shows this as well), but Hardy and Grant continued on down Olive Street and turned onto 92nd Avenue, passing within 10 to 15 feet of Coleman's undercover vehicle.  Coleman believed, based on Hardy's movements, that he had a firearm in his waistband.  A few minutes later, Coleman saw Hardy and Grant walking back toward the liquor store.

9

For safety reasons, Officer Rosin waited about 15 minutes before calling in uniformed police officers to investigate at the scene while he remained undercover. The officers arrested Hardy at the liquor store. He was wearing a black hooded sweatshirt and black pants with white stripes down the sides, and was unarmed.

The jury found Hardy guilty on all charges. The court imposed a total sentence of 19 years and 8 months, consisting of an aggravated term of 9 years on what the court designated as the principal conviction, which was on the count 5 charge of assault with a semi-automatic firearm, with an aggravated 10-year enhancement for personal use of a firearm. The court imposed and stayed a seven-year sentence on count 1, for the willful and malicious discharge of a firearm at an occupied vehicle, and imposed and stayed eight-month sentences on count 3 and count 4, all under section 654, and sentenced Hardy to a consecutive 8-month term on count 2.

Hardy timely filed a notice of appeal.

## DISCUSSION

Hardy argues his convictions on count 1, for discharge of a firearm at an occupied motor vehicle, and on count 5, for assault with a semi-automatic firearm, must be reversed for multiple reasons. We conclude his count 5 conviction must be reversed because the trial court prejudicially erred by failing to conduct an evidentiary hearing, as requested by Hardy, to determine the reliability of the Shotspotter evidence as proof of the number of shots fired. This reversal is subject to the trial court's holding a *Kelly*/*Frye* hearing upon remand and reinstating the conviction if it concludes the

10

Shotspotter evidence was admissible at trial. We reject the remainder of Hardy's arguments, and affirm his conviction on count 1.

**I.**

***Hardy's Assault with a Semi-automatic Firearm Conviction Must Be Reversed.***

Hardy was charged in count 5 with assault with a semi-automatic firearm. The Shotspotter evidence consists of the audio recording of seven percussive sounds and Officer Rosin's testimony that he received a notification from Shotspotter shortly after observing Hardy fire "six or seven" shots, which evidence Rosin testified was "consistent" with his observations. The recording is the strongest, and only unambiguous, evidence that Hardy fired more shots than can be fired from a revolver, which the evidence indicates can only fire up to six shots. Hardy argues the trial court's admission of the Shotspotter evidence without conducting an evidentiary hearing to determine whether such evidence is reliable was prejudicial error under *Kelly*/*Frye*.

### A. The Relevant Proceedings Below

#### 1. *Hardy's Motion in Limine*

Before trial, Hardy filed a motion in limine to exclude the Shotspotter evidence. Among other things, he argued the Shotspotter evidence was inadmissible under *Kelly*/*Frye* because the company's "process regarding gunshot identification and location has not been accepted by the general scientific community," and requested an evidentiary hearing under Evidence Code section 402. He contended the prosecution could not meet its burden of showing the technology's scientific acceptance because it had not designated any expert to testify about it. The prosecution did not file a written opposition to the motion.

11

During a break in the prosecution's presentation, the court held a hearing on Hardy's motion. After an apparently off-the-record discussion, the court said it was inclined to admit the Shotspotter audio recording, including because the prosecutor was "not going to claim it to be a gunshot as opposed to backfire or anything else." Defense counsel argued it was inadmissible hearsay. The prosecutor responded that he would introduce it merely to show why certain investigating Oakland police officers responded to the scene of the shooting and that, used for this purpose, it was not testimonial in nature and its authenticity went to its weight rather than its admissibility. "I'm not purporting it to be shots," he said. "I'm using this essentially, if the Court does think that it's hearsay, it's essentially the effect of [*sic*] the listener as to why are these officers responding to this area?" He added, "Additionally, I think it goes to corroborate from what Officer Rosin [the undercover officer who saw Hardy fire a handgun from a car across the street] essentially on-views on that night," and then referred again to the evidence being relevant to why the officers went to the scene.

The court asked the prosecutor why someone from Shotspotter could not testify about the audio recording. The prosecutor replied that he had just gotten the report from Shotspotter the previous week, and that he would introduce the evidence through Officer Airoso, who "gets a Shotspotter notification and goes essentially to [the scene]," and not through the "surveilling officer."

Defense counsel responded that the Shotspotter evidence lacked foundation, and repeated his contentions, made first in his written motion, that an Evidence Code section 402 hearing should be held and that the evidence, without expert testimony confirming the scientific reliability of the underlying technology, was inadmissible under *Kelly/Frye*.

12

Without further explanation, the court then ruled that it would admit the Shotspotter evidence.

## 2. *The Prosecution's Use of the Shotspotter Evidence*

Contrary to his representation at the motion in limine hearing, the prosecutor did not introduce the Shotspotter evidence through Officer Airoso, although he called Airoso as his next witness.[3]  Instead, over Hardy's continuing objection on the same grounds as his motion in limine, the prosecutor introduced the Shotspotter evidence through Officer Rosin, the undercover officer who had surveilled the scene on the night of the incident from a car parked on 90th Avenue across from the store.

Specifically, after Rosin testified that he saw Hardy fire "six or seven shots" in the direction of a white sedan traveling north on 90th Avenue, the prosecutor asked him about Shotspotter.  Rosin said it was "technology that we have in Oakland that we use that detects the sound of gunfire," but that the police department did not operate it.  It was "designed to give us gunfire that has just occurred," and gave "a detailed description of where it happened at and how many rounds were fired.  It also sends us an audio clip so we can listen to the gunshots."  He had used Shotspotter "multiple times a day" throughout his career, receiving its notifications via an application on his phone.

Officer Rosin further testified that he received a Shotspotter notification on the night of the incident about "ten or 20 seconds" after he saw Hardy fire six or seven shots.  The notification provided him with the number of shots fired, the location and time of the shooting, and an audio recording,

---

[3]  Instead, Officer Airoso testified that he was part of an arrest team supporting the undercover operation and went to the store about 30 minutes after Officer Coleman radioed that a third party going in and out of a silver Isuzu appeared to have a firearm.

which he listened to when he received it.  After listening to the recording at trial, he said it was "consistent" with what he observed and heard that night.

After Officer Rosin testified, the defense moved for a mistrial on the ground that admission of the Shotspotter evidence violated Hardy's due process rights.  The court interrupted defense counsel's argument to comment that counsel had already been heard on the subject, and denied the motion.  Later, the court also overruled the defense objection to the admission of the audio recording.

In closing argument, the prosecutor repeatedly referred to the Shotspotter audio recording for the truth of what it contained.  He played the recording at the beginning of his argument and asserted it showed Hardy had fired seven shots, then repeated this assertion a short time later.  The prosecutor also argued, apparently based on Rosin's testimony, that Rosin received a Shotspotter "activation" and "notification" on the night of the incident that indicated seven shots were fired at the location.  After the defense argued there was no direct evidence that Hardy had fired a semi-automatic weapon, including because "[w]e didn't hear any evidence" on the audio recording, the prosecutor contended that "[t]he Shotspotter is circumstantial evidence that seven shots rang out at that time and location," and reminded the jury of the evidence that a revolver could not fire more than six shots.  During its deliberations, the jury sent a note to the court asking to review the Shotspotter audio recording.

## B.  Analysis

### 1.  *The Court Erred in Admitting the Shotspotter Evidence Without Holding a Kelly/Frye Hearing.*

The trial court denied Hardy's motion in limine without conducting an evidentiary hearing to determine whether Shotspotter's technology meets the standard of scientific reliability required under *Kelly*/*Frye*, although the

14

defense requested such a hearing.  The court's initial ruling is not necessarily incorrect because at the motion in limine hearing, the prosecutor represented that he would introduce the Shotspotter evidence not for the truth of what it contained but through Officer Airoso simply to explain why certain police officers responded to the scene of the incident.  If the prosecutor had done as he said he would, the only question would have been whether the police received the notification, not what the Shotspotter evidence showed, and no *Kelly*/*Frye* hearing would have been required.

But the prosecutor did not introduce or use the Shotspotter evidence in the manner he had represented he would.  He did not simply ask Airoso about it to show why some of the officers went to the scene; nor did he use it for that purpose.  Instead, he introduced the Shotspotter evidence through Officer Rosin, who was already present at the scene when the incident occurred, and the trial court did not instruct jurors that there were any limits on the purposes for which they could consider it.  Rather, the court summarily overruled Hardy's continuing objections to the prosecution's introduction of the evidence through Rosin, made on the same grounds as those asserted in his motion in limine, including *Kelly*/*Frye*, and denied Hardy's motion for a new trial and overruled his objection to the admission of the Shotspotter audio recording without hearing any additional argument.  These rulings required, and now require, a different analysis than the court's initial ruling.  We must determine whether, when the prosecutor introduced the Shotspotter evidence through Officer Rosin for the purpose of proving that Hardy fired seven shots, which could only mean that he used a semi-automatic firearm, the court should have revisited whether Shotspotter's technology met the *Kelly*/*Frye* standard.

Under *Kelly/Frye*, " 'when faced with a novel method of [scientific] proof,' " our Supreme Court requires " 'a preliminary showing of general acceptance of the new technique in the relevant scientific community' before the scientific evidence may be admitted at trial." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831.)  As our Supreme Court has also instructed, "Because the inventions and discoveries which could be considered 'scientific' have become virtually limitless in the near-70 years since *Frye* was decided, application of its principle has often been determined by reference to its narrow 'common sense' purpose, i.e., to protect the jury from techniques which, though 'new,' novel, or ' "experimental," ' convey a ' "misleading aura of certainty." ' " (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155-1156.)  In other words, *Kelly*/*Frye* " 'is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not.' " (*Daveggio and Michaud*, at p. 831.)

*Kelly*/*Frye* involves "a three-pronged test to establish the reliability of scientific testing and its scientific basis to determine its admissibility.  'The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community.  [Citation.]  The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject.  [Citation.]  The third prong requires proof that the person performing the test in the particular case used correct scientific procedures.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 244 (*Lucas*), disapproved in part on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn.19.)  The proponent of the evidence has the burden of satisfying each prong. (*People v. Roybal* (1998) 19 Cal.4th 481, 505.)  There is "no clear definition of science" under *Kelly*/*Frye*.  (*Lucas*, at p. 223.)  "Accordingly, the application of that term is guided by resort to the 'narrow

16

"common sense" purpose' behind the rule: 'to protect the jury from techniques which . . . convey a " 'misleading aura of certainty.' " ' . . . The analysis is designed to address 'scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' " (*Ibid*.)

We must first determine whether Shotspotter's technology was of such novelty to the pertinent scientific community and our courts as to require *Kelly*/*Frye* analysis. Our Supreme Court has instructed that the *Kelly*/*Frye* standard "applies to that limited class of expert testimony which is based, in whole or part, on a technique, process or theory which is *new* to science and, even more so, the law. The courts are willing to forgo admission of such techniques completely until reasonably certain that the pertinent scientific community no longer views them as experimental or of dubious validity. This all-or-nothing approach was adopted in full recognition that there would be a ' "considerable lag" ' between scientific advances and their admission as evidence in a court proceeding." (*People v. Stoll*, *supra*, 49 Cal.3d at p. 1156.)

In addressing defendant's *Kelly/Frye* argument, the trial court should have analyzed whether Shotspotter's technology, in whole or part, is a technique, process or theory which is sufficiently novel to science and, even more so, the law, so as to require *Kelly*/*Frye* review. Our review of the case law indicates that it is. Only two reported cases in California, both in our appellate courts, have even mentioned Shotspotter, both briefly and in 2019, and neither addressed whether Shotspotter evidence met the *Kelly/Frye* standard for reliability and therefore should have been admitted. (See *People v. Coneal* (2019) 41 Cal.App.5th 951, 955 & fn. 3 [describing Shotspotter as "an acoustic gunfire detection and location system" that "has a 25-meter margin of error," and stating when and at what location Shotspotter

17

identified certain numbers of gunshots fired]; *People v. Rubio* (2019) 43 Cal.App.5th 342, 345 [Shotspotter, described as a "system" that "detects and triangulates the location of gunfire via microphones deployed throughout the city," notified officer of bursts of gunfire, causing him to respond to location where witnesses corroborated they had heard gunfire].) Even beyond California, we have found only one reported case in the country that has considered whether Shotspotter's technology was reliable enough to support admission of Shotspotter evidence of gunshots, a 2014 state court case from Nebraska, *State v. Hill* (2014) 288 Neb. 767 (*Hill*).

In *Hill*, the defendant was convicted of a murder in Omaha, Nebraska based on evidence that included a 2012 Shotspotter report of gunfire at a particular time and place. Before trial, the defendant moved in limine to exclude this report, including because Shotspotter's methodology was not scientifically valid. (*Hill*, *supra*, 288 Neb. at pp. 770, 774.) The trial court conducted a hearing at which it heard the expert testimony of the lead customer support engineer at SST, Inc., described as a company that "sells a product called the Shotspotter to cities across the country," and the court subsequently denied the defendant's motion for reasons it explained in a 15-page order. (*Id*. at pp. 774-778, 782.) The Nebraska Supreme Court, analyzing the trial court's decision under Nebraska's "*Daubert/Schafersman* jurisprudence," a standard similar to California's *Kelly/Frye* standard,[4]

---

[4] Under Nebraska's *Daubert/Schafersman* jurisprudence, "the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion" to "ensure that the courtroom door remains closed to ' "junk science" ' that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact." (*Hill*, *supra*, 288 Neb. at p. 792, and fns. 39 and 40, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 and *Schafersman v. Agland Coop* (2001) 262 Neb. 215.)

concluded the trial court did not abuse its discretion in denying Hill's motion. (*Hill,* at pp. 792-794.)  It summarized Shotspotter as follows:

"The ShotSpotter is an acoustic gunfire detection and location system of GPS-enabled microphones placed in various locations of a municipal area. SST has been in existence since 1995 and has been selling and maintaining ShotSpotter systems since 1996.  In the summer of 2011, SST installed a ShotSpotter system in northeast Omaha. . . . [¶] [T]he ShotSpotter system in Omaha consisted of approximately 80 sensors, spaced roughly 400 to 500 meters apart.  Each sensor has four GPS-enabled microphones.  The digital signal processors of the sensors measure sound input to determine if the sound meets 28 different audio characteristics of 'impulsive audio pulses,' or a 'bang, boom, or pop,' and could thus be categorized as a possible gunshot. [¶] If the sound meets the preprogrammed criteria for a possible gunshot, the system transmits the information to a central location server, which uses triangulation to pinpoint the latitude and longitude of the sound and uses a process called 'geolocation' to place that location on a map. [¶] Incident review staff in California then quickly look at the audio waveform and listen to a recording of the event to discern if it is a false positive for a possible gunshot.  Once the incident review staff rule out a false positive, they send an alert to the police dispatchers." (*Hill*, *supra*, 288 Neb. at p. 775.)

The Shotspotter expert "testified that the incident review staff are specially trained in recognizing the audio waveform characteristics of gunfire and in recognizing the sound of gunfire," and were required "to correctly identify 80 percent of 500 audioclips during performance testing."  (*Hill*, *supra*, 288 Neb. at p. 775.)  Further, "the mathematical principles" behind the triangulation method used to determine location were "actually very old," and "[t]he practical application of it" dated back to World War I.  (*Id.* at

19

pp. 775-776.) Shotspotter used a redundancy of sensors and required only three "to actually hear and participate in the incident." (*Id.* at p. 776.)

The expert further testified that the Shotspotter system was designed to make accurate detections if up to 20 percent of sensor capacity was lost, at which point the company dispatched repair technicians. (*Hill, supra,* 288 Neb. at pp. 776-777.) Shotspotter's "official margin of error for the location of detected gunfire" was a 150-foot radius, but it "regularly achieve[d] accuracy of a radius of 10 or 20 feet or better." (*Id.* at p. 776.) Shotspotter "guarantee[d] that it will give a correct location, within this margin of error, for 80 percent of detectible outdoor gunfire in the system area. Gunfire that is silenced or masked by other sounds is not considered detectible." (*Ibid.*)

This summary indicates that Shotspotter's technology remains sufficiently novel to merit our courts' review of it under *Kelly/Frye* to determine its scientific validity and reliability before admitting Shotspotter evidence to prove the facts of a particular shooting.[5] And even assuming review of such evidence by another state's court could be considered for that purpose in California courts, there is no evidence that the technology used by the Oakland Police Department or the staff review methodology it or

---

[5] See also *United States v. Rickmon* (7th Cir. 2020) 952 F.3d 876, in which the court discussed a motion to suppress evidence of a firearm seized at a traffic stop that resulted from a Shotspotter report of shots fired at a particular time and place. (*Id.* at pp. 879-880.) The district court had "received evidence that [Shotspotter] is not always accurate and that officers may not solely rely on it to locate gunfire." (*Id.* at p. 879, fn. 2.) However, the appellate court determined that the defendant's argument did not require it to "reach the reliability of Shotspotter," although "[i]n some future decision, we may have to determine Shotspotter's reliability where a single alert turns out to be the only articulable fact in the totality of the circumstances." (*Ibid.,* citing *Hill, supra,* 288 Neb. 767.)

Shotspotter employed in Oakland in September 2018 were the same as those used in Omaha, Nebraska in 2012. For this reason, as well as the lack of any case law before or after *Hill*, in California or any other court, establishing the reliability of Shotspotter evidence, we hold that the trial court was required to review the Shotspotter evidence under *Kelly/Frye* when offered to prove the number of shots fired before admitting it. Therefore, the trial court erred by failing to do so.

Moreover, because there was no *Kelly/Frye* hearing, the prosecution failed to meet its burden of satisfying the three prongs of the *Kelly*/*Frye* reliability test. (See *Lucas*, *supra*, 60 Cal.4th at p. 244 [outlining the three prongs].) That is, the prosecution presented no evidence that Shotspotter's technology was generally accepted as reliable in the pertinent scientific community. Officer Rosin was not offered as an expert and said nothing indicating he was anything more than a user of the technology. And the prosecution offered no proof that the Shotspotter data used by police in this case was the product of scientifically reliable technologies and procedures.

The People argue the trial court properly admitted the Shotspotter evidence for two reasons. First, Officer Rosin did not need to testify about how Shotspotter worked because "[h]is testimony did not portray a' "misleading aura of certainty" ' " to the jury requiring a *Kelly*/*Frye* hearing. Second, the audio recording was admissible as a writing under Evidence Code section 250[6] because Officer Rosin testified it was "consistent" with his

---

[6] Evidence Code section 250 states, " 'Writing' means handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored."

personal observations, citing *People v. Dawkins* (2014) 230 Cal.App.4th 991, 1003 [deputy's testimony was sufficient to authenticate an automated recording of a 911 call made to his department because he had general knowledge of the automated system, and had searched for, found and downloaded the recording from the system].) These arguments are unpersuasive for multiple reasons, most importantly because they address authentication, which is not at issue in this appeal, and do not contend with whether Shotspotter's technology was scientifically valid and properly applied as required under *Kelly/Frye*.[7] Therefore, the trial court erred by admitting the Shotspotter evidence without limitation, an error that was compounded by the prosecution's argument that the evidence proved seven shots were fired.

## 2. *The Court's Error Requires Reversal*.

The court's error was prejudicial and requires that we reverse Hardy's conviction on count 5, for assault with a semi-automatic weapon.

Hardy argues the trial court's error implicates federal constitutional rights directly affecting the ascertainment of his guilt on that count, citing

---

[7] Further, Officer Rosin did not testify that he had any personal knowledge regarding Shotspotter's generation of the recording, unlike the deputy in *Dawkins*. Moreover, Rosin's testimony that the recording was "consistent" with what he witnessed on the night of the incident did not establish the recording's reliability on the only significant issue—whether Hardy fired more than six shots—because Rosin recalled only that he heard "six *or* seven shots." (Italics added.) That the recording was "consistent" with this recollection may have been relevant to the recording's authentication, but it did not mean the recording was sufficiently reliable to merit admission for the purpose of determining that Hardy discharged seven shots and, therefore, must have fired a semi-automatic firearm and not a revolver.

22

*Chambers v. Mississippi* (1973) 410 U.S. 284, 302-303.[8]  The People argue

against reversal under the state standard for evaluating prejudice, *People v.*

*Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), contending it is not reasonably

probable that, but for any error, Hardy would have received a better outcome.

We conclude the error was prejudicial under any standard, including

the *Watson* "reasonable probability" standard for state law error that the

People argue we should apply.  A "reasonable probability" "does not mean

more likely than not, but merely a *reasonable chance*, more than an *abstract*

*possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704,

715.)  It "does not mean 'more likely than not,' but merely 'probability

sufficient to undermine confidence in the outcome.' " (*Ibid.*, favorably quoting

*Strickland v. Washington* (1984) 466 U.S. 668, 693-694, 697, 698.)  Therefore,

reversal is necessary when it cannot be determined whether or not the error

affected the result, as in such a case there "exists . . . at least such an equal

balance of reasonable probabilities" " 'that it is reasonably probable that a

result more favorable to the appealing party would have been reached in the

---

[8]  Our Supreme Court, referring to federal constitutional rights to due process, has recognized that "the admission of evidence in violation of state law may also violate due process, but only if the error rendered the defendant's trial fundamentally unfair." (*People v. Merriman* (2014) 60 Cal.4th 1, 70; accord, *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair"]; *People v. Partida* (2005) 37 Cal.4th 428, 439 [quoting *Falsetta*].)  An appellate court has further explained, " 'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.)" (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817.)

absence of the error.' " (*Watson*, *supra*, 46 Cal.2d at pp. 837.)  Such is the case here.

The Shotspotter evidence was the only unambiguous evidence that Hardy had fired seven shots and, therefore, must have used a semi-automatic firearm rather than a revolver, which could only fire up to six shots. Otherwise, the People presented a murky case for which there is at least an equal chance that a reasonable juror would or would not find Hardy culpable for assault with a semi-automatic firearm.  No firearm associated with the bullet casings found at the scene was ever recovered; the main percipient witness to the shooting, Officer Rosin, testified only that Hardy had fired "*six or* seven shots" (italics added) from a weapon the officer did not see; the other percipient witness, Officer Coleman, testified that he heard "about *six*" shots (italics added); the surveillance video that captured Hardy as he fired did not show the weapon he used, had no audio, and revealed only two muzzle flashes; and only six bullet casings were found in the vicinity of where Rosin testified he saw Hardy fire.

The best indication that Hardy fired a semi-automatic firearm, other than the Shotspotter evidence, was the testimony of Officers Coleman and Airoso, based on their own experiences, that a semi-automatic firearm automatically ejects bullet casings as it is fired, coupled with the evidence that casings were recovered on the grassy and paved areas of the sidewalk. But this evidence was far from conclusive.  First, only six casings were found. Second, Officer Coleman acknowledged that such bullet casings could be manually emptied out of a revolver.  Third, the surveillance video shows that a few moments passed between the time Hardy appeared to fire something and the time he began walking down Olive behind his two associates. Fourth, Officer Rosin was not asked about and did not testify as to whether

he had observed Hardy's actions during that time or saw bullet casings being ejected from the firearm.[9]

The part of Officer Rosin's testimony that is relevant to whether Hardy fired a semi-automatic or a revolver also raised as many questions as it provided answers. Officer Rosin acknowledged that he did not see the type of firearm Hardy used. He could only recall that he heard "six or seven" shots and, similarly, that a revolver could fire "five or six" shots. And he remembered seeing spent casings lying in the street on 90th Avenue, but according to the police evidence technician, none were found there.

The ambiguity resulting from the other evidence explains why the prosecutor placed the Shotspotter evidence front and center in his closing argument, playing the audio recording to the jury at the outset and referring to the seven percussive sounds that could be heard on it repeatedly in his argument. The Shotspotter evidence, particularly the audio recording, was almost certainly decisive, and what verdict the jury would have reached on count 5 without it is entirely unclear. This lack of clarity undermines our confidence in the verdict on count 5 and requires us to reverse under any prejudice standard. As we discuss further in the disposition part of this opinion, this conviction is subject to reinstatement by the trial court upon remand if, after conducting a *Kelly/Frye* hearing, the court concludes the Shotspotter evidence was admissible at trial.

---

[9] Officer Coleman also testified that shell casings ejected from a semi-automatic pistol have ejector marks on them, but neither party contends his testimony, unaccompanied by any evidence that such marks appeared on the casings admitted into evidence, demonstrates that Hardy used a semi-automatic pistol.

## II.

### *Any Error by the Preliminary Hearing Magistrate Regarding Hardy's Cross-Examination of Officer Rosin Was Harmless.*

Hardy also argues we must reverse his convictions for count 5, assault with a semi-automatic firearm, and count 1, willful and malicious discharge of a firearm at an occupied motor vehicle in violation of section 246, based on events that occurred at the preliminary hearing. Specifically, Hardy contends on multiple grounds that the preliminary hearing magistrate should not have ordered him held to answer on count 1 and that he should not have been tried on count 5 (which was added via an amended information on the first day of trial) because, upon Officer Rosin's claim of an official privilege to withhold information about his location under Evidence Code section 1040, the magistrate erroneously barred defense counsel from cross-examining Rosin at all regarding his location and ability to perceive Hardy on the night of the incident. Hardy makes a number of sometimes confusing arguments about why the magistrate erred in preventing such cross-examination, including that the magistrate abused his discretion under Evidence Code section 352 and did not properly consider Rosin's claim of official privilege under Evidence Code section 1040. We see no need to sort through Hardy's mélange of arguments[10] because we conclude that, assuming for the sake of argument that the magistrate erred, any error was harmless.

#### A. The Relevant Proceedings Below

Prior to the preliminary hearing, the People's complaint, as amended, included a count 1 that alleged Hardy had discharged a firearm with gross

---

[10] Hardy also refers to his rights to effective assistance of counsel, to present exculpatory evidence, to due process, and to a ruling adverse to the prosecution if a court sustains a claim of official privilege regarding "material" information within the meaning of Evidence Code section 1042.

26

negligence in violation of section 246.3. At the preliminary hearing, the People presented only one witness, Officer Rosin. He testified on direct that he saw Hardy fire a "handgun" "6 or 7" times in the direction of a vehicle that had just passed by Hardy, which was consistent with Rosin's later trial testimony. Rosin said he was "between 20 and 30 feet" away and had a clear and unobstructed view of Hardy (rather than the approximately 45 to 50 feet he later indicated at trial).

On cross-examination, Officer Rosin was asked to mark on a map his location on the night of the incident. He responded, "I would have to invoke [section] 1040 of the Evidence Code at this time" because "getting that specific into where I was is going to enter [*sic*] additional investigations."[11] Hardy's counsel responded that he was just trying to understand "whether you were in front of him, behind him, above him, to the left or to the right," but Officer Rosin declined to answer based on the section 1040 privilege. The magistrate asked Rosin, "Did you have a clear and unobstructed view?" and Rosin indicated that he did. Defense counsel and the magistrate then had the following exchange:

"[DEFENSE COUNSEL]: Your Honor, it's important to me to understood [*sic*] and Mr. Hardy to understand, where [Officer Rosin] was in relationship to viewing [Hardy] as to how he was able to identify Mr. Hardy or distinguishing factors, his proximity to the location.

---

[11] Evidence Code section 1040, subdivision (b)(2) provides in relevant part that a public entity is privileged to "refuse to disclose official information, and to prevent another from disclosing official information, if . . . [d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ."

"[THE MAGISTRATE]: Well, he's stated how many approximately feet he was away, and he has also stated that he had a clear and [un]obstructed view. So for purposes of a preliminary hearing, I'll find that further examination in this area is irrelevant under 352 of the Evidence Code.

"[DEFENSE COUNSEL]: Just so I'm clear, Your Honor, under 352, his location and ability to perceive Mr. Hardy is no longer going to be the subject of cross-examination?

"[THE MAGISTRATE]: That's right, because I'm ruling that it's essentially—that the relevance is substantially outweighed for purposes of a preliminary hearing by its—that it gets into collateral matters which consumes an undue amount of time."[12]

At the hearing's end, the magistrate, at the prosecution's request, ordered that Hardy be held over for a new charge—the willful and malicious discharge of a firearm at an occupied motor vehicle in violation of section 246[13]—rather than for the grossly negligent discharge of a firearm alleged in count 1 of the complaint. The prosecution then filed an information as authorized by the court.

Hardy filed a motion in the trial court under section 995 to dismiss this information on the grounds that he was denied his state and federal constitutional rights to effectively cross-examine Officer Rosin about his

---

[12] Defense counsel also asked Rosin whether a surveillance video that Rosin had mentioned viewing on the night of the incident had been given to the prosecution. Upon prosecution objection, counsel indicated the defense had not received the video in response to its discovery requests, making cross-examination on the video difficult. The court told counsel to move on because the hearing was "not to be for purposes of discovery."

[13] Section 246 provides in relevant part, "Any person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony . . . ."

location at the scene, and the People opposed the motion. At the hearing, after the prosecutor brought up the abuse of discretion standard under Evidence Code section 352, defense counsel argued that the magistrate had made an arbitrary and capricious limitation on his cross-examination that was "absurd." The court denied the motion, concluding the magistrate did not make an "absurd" ruling and that, in light of the corroborating evidence (such as the spent cartridges and the gun found in the Isuzu, which at the time of the preliminary hearing had not yet been eliminated as the gun fired by Hardy), Hardy failed to show prejudice from any error.

Prior to trial, Hardy moved in limine for an order that Officer Rosin's location at the scene be produced immediately, or at least by the close of the prosecution's case-in-chief. Also, Hardy, anticipating the prosecution would claim the official privilege under Evidence Code section 1040 to withhold this information, asked the court to rule on the applicability of that privilege prior to trial and, if it sustained the privilege, dismiss the case under Evidence Code section 1042, subdivision (a).[14]

Also prior to trial, the prosecution filed a brief asserting it would withhold Officer Rosin's location under Evidence Code 1040. It insisted that Hardy had "ample areas ripe for cross-examination" of Rosin's observations and that Rosin's location was not material, particularly in light of the "numerous other corroborating items of evidence" that supported his observations.

---

[14] Evidence Code section 1042, subdivision (a) provides that, if the privilege is sustained, the court "shall make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material."

The trial court ruled on Hardy's other motions in limine in one hearing, but passed over the motion regarding Rosin's location, apparently in anticipation of a separate argument on the Evidence Code section 1040 issue. However, the record contains no further mention of either that issue or the defense's related request for discovery on Rosin's location.

Also, on the eve of trial the prosecution filed a request to amend the information to add count 5, assault with a semi-automatic firearm. The prosecution stated that the new charge was "proved at the preliminary hearing," and that the amended information "accurately reflects the evidence presented at the preliminary hearing." At the hearing on this request, Hardy objected to the amendment. His counsel contended the addition of count 5 more than doubled Hardy's potential exposure, argued that it amounted to vindictive prosecution in retaliation for Hardy exercising his right to go to trial, and expressed doubts that it was adequately supported by the evidence presented at the preliminary hearing.

The prosecutor argued that evidence presented at the preliminary hearing supported the new count 5 charge, quoting from Officer Rosin's testimony at the hearing. As we have already indicated, Rosin testified at the preliminary hearing that on the night of the incident from a distance of 20 or 30 feet away, he saw Hardy fire a "handgun" "6 or 7" times in the direction of a vehicle that had just passed by Hardy. Rosin further testified that he had been told that .380-caliber casings were recovered in the roadway. At the hearing on his proposed amendment of the information, the prosecutor contended the casings were evidence of bullets fired by Hardy from a semi-automatic firearm, the casings having been found in the vicinity of where Rosin saw Hardy fire. After hearing this argument, the trial court

allowed the prosecution to amend the information. The court then proceeded with jury selection.

Later that same day, Hardy's counsel again brought up his objection to the amended information as follows: "I wanted to put on the record an issue on the amended complaint. As I mentioned in chambers and forgot to put on the record, I had requested an opportunity to file a [section] 995 [motion] on the amended complaint given our belief that . . . there was not evidence in the preliminary hearing transcript to support the amendment." The trial court replied that it considered Hardy's objection to the amended information as a section 995 motion and "implicitly denied it." The court added, "But I know you want to do that. I know you mentioned that ahead of time. I took it as a 995, your objection to the amendment. I ruled against it."

The next morning, Hardy filed a written motion to set aside the amended information under section 995 and on due process grounds.[15] Hardy contended that there was no evidence presented at the preliminary hearing concerning his use of a semi-automatic weapon and that the preliminary hearing magistrate had prejudicially violated his due process rights by barring his counsel from cross-examining Officer Rosin. The record does not contain argument or a ruling on this written motion, possibly because of the court's denial of Hardy's oral motion under section 995 the day before.

Jury selection was completed that same day and the trial began that afternoon. Evidence was presented until the following afternoon, when closing arguments began. The jury began its deliberations the following day.

At trial, Rosin simply revealed his location on direct examination. The prosecutor, examining Rosin about his surveillance on the night of the

---

[15] That same morning, Hardy also filed a motion dismiss the information for vindictive prosecution, an issue that he does not raise on appeal and which, therefore, we will not further discuss.

31

incident, asked him, "So were you on the street, were you in a building, where were you?" The defense did not object to this question, to any of the related questions that followed, or to any of Rosin's responses, and did not seek a continuance of the trial.

As we have already indicated, Rosin testified that he surveilled the scene using his eyesight alone and binoculars from a parked car on 90th Avenue across the street from the store. His vantage point allowed him to "watch[] what was happening in front of me and to the sides of me" and gave him "a clear and unobstructed view of this scene." He pointed out the car parked on 90th Avenue in which he surveilled the scene on the store's surveillance video. In the video, this location is directly across the street from the corner where three individuals stand for a time and one of them, wearing white striped dark pants, hurries into the street and seems to fire something after a white car passes him.

Rosin further testified that he saw Hardy, wearing distinctive white striped black pants, stand with Grant and Wilson for a couple of minutes on the corner and then hurry into 90th Avenue where he fired a "handgun" six or seven times in the direction of a white sedan that had just passed by him. Officer Coleman recalled hearing Rosin on the radio immediately after Coleman heard gunshots saying that he had just seen Hardy shoot at a passing vehicle.

For the most part, Officer Rosin's account was corroborated by the surveillance video, Officer Coleman's testimony that he saw Hardy walking with another person down Olive Street from 90th Avenue right after he heard about six shots being fired, and the spent cartridges found in the area where Rosin said Hardy and two others had stood.

32

On cross-examination, defense counsel asked Rosin again about his testimony on direct that he was about "45 to 50" feet away from Hardy when he observed him. Counsel also asked if Rosin was aware that the actual width of 90th Avenue was 90 feet, and Rosin said he was not. Rosin also said during cross-examination that the street was lit and the rear windows of the car he was sitting in were tinted.

**B. Analysis**

Essentially, Hardy's appellate claim is a challenge to the trial court's denial of his two section 995 motions. He filed the first motion to dismiss the information the prosecution filed after the conclusion of the preliminary hearing, and he filed the second motion after the prosecution filed its amended information on the eve of trial to add count 5. He largely based both motions on his contention that the magistrate erred in barring his counsel's cross-examination of Officer Rosin, preventing him from showing there was a lack of evidence to support the charges he challenges on appeal, contained in counts 1 and 5. Our analysis is the same regarding Hardy's challenge to the court's denial of both motions: assuming for the sake of argument that the magistrate erred, it was harmless.

In reviewing the trial court's denial of section 995 motions, "we 'in effect disregard[] the ruling of the superior court and directly review[] the determination of the magistrate holding the defendant to answer.'" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1071-1072.) We review section 995 claims of legal error de novo. (See *Lexin,* at p. 1072 [statutory interpretation issues raised in a section 995 motion are reviewed de novo].) "Insofar as it rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendants to answer, i.e., whether the evidence is

such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt.'" (*Lexin,* at p. 1072.)

At the preliminary hearing, the magistrate based his order barring *any* cross-examination of Officer Rosin regarding his location and ability to perceive Hardy on its discretion to limit the introduction of evidence about unduly time-consuming "collateral" matters under Evidence Code section 352. The magistrate ordered this prohibition upon Officer Rosin's claim of the official privilege and indication to the court that he had an unobstructed view of events on the night of the incident.

Hardy correctly argues that defendants have the right under section 865 to cross-examine witnesses at a preliminary hearing.[16] A court generally has the discretion to limit a defendant's cross-examination of a witness when appropriate under Evidence Code section 352. (See *People v. Jennings* (1991) 53 Cal.3d 334, 372 [holding that impeachment evidence "on collateral matters" that was "only slightly probative" of witness veracity could be excluded from trial under Evidence Code section 352 without infringing the defendant's constitutional confrontation rights]; *People v. Snow* (2003) 30 Cal.4th 43, 90 ["Application of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense"].) Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

---

[16] Section 865 provides that at a preliminary hearing, "witnesses must be examined in the presence of the defendant, and may be cross-examined in his behalf." Hardy does not assert the violation of any Sixth Amendment right to confront witnesses at a preliminary hearing.

However, there is a difference between limiting cross-examination on a significant issue and denying it altogether. We have concerns about the magistrate's actions here, even considering the relatively low bar required for the prosecution to prove probable cause,[17] because, after the magistrate asked Rosin whether he had a clear and unobstructed view, he prohibited further cross-examination on a highly probative subject that had already been raised on direct. Nonetheless, we will not further discuss these concerns because we conclude that any error was harmless.

We determine whether the magistrate's error was prejudicial to Hardy by evaluating the error's impact on Hardy's subsequent trial. As Hardy acknowledges, "irregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination." (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529.)[18]

---

[17] "A magistrate will make an order holding a defendant to answer a felony charge if there is "sufficient cause" to believe the defendant is guilty. (Pen. Code, § 872.) 'Sufficient cause' or 'probable cause' means a state of facts that would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused. [Citation.] The burden that this standard places on the prosecution at the preliminary hearing is 'quite distinct from that necessary to obtain a conviction before a judge or jury.' [Citation.] To satisfy the standard of sufficient or probable cause, the evidence 'need not be sufficient to support a conviction.' " (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1041, italics omitted.)

[18] Our Supreme Court has instructed that "jurisdiction in the fundamental sense" refers to the "legal power to hear and determine a cause." (*People v. Pompa-Ortiz, supra,* 27 Cal.3d at p. 529.) The court, referring to jurisdiction in the broader sense, further instructed that "[t]he presence of a

35

We evaluate whether an abuse of discretion under Evidence Code section 352 and an error regarding a claim of official privilege under Evidence Code section 1040 were prejudicial to a defendant by applying the state standard established in *Watson, supra*, 46 Cal.2d 818. That is, we determine whether there was a reasonable probability that Hardy would have achieved a more favorable result on count 1 in the absence of the error. (See *Watson,* at p. 836; see also *People v. Alcala* (1992) 4 Cal.4th 742, 790-791 [applying *Watson* standard to a section 352 error]; *People v. Roberts* (1992) 2 Cal.4th 271, 302 [applying *Watson* standard to a section 1040 error].) Under this or any standard,[19] we conclude the magistrate's error was harmless.

As we have already recounted, at the trial, neither Officer Rosin nor the prosecution claimed the official privilege under Evidence Code section 1040 to withhold any information. Instead, without any objection by the defense, Rosin testified about his location on direct and on cross-examination. The defense asked few questions about his location or his ability to perceive Hardy on the night of the incident. This was understandable in light of the store's surveillance video making clear that Rosin had an unobstructed view of Hardy from directly across the street in an area that was lit by street lights.

jurisdictional defect which would entitle a defendant to a writ of prohibition prior to trial does not necessarily deprive a trial court of the legal power to try the case if prohibition is not sought." (*Ibid*.) Hardy does not contend the magistrate made any error that was jurisdictional in the fundamental sense.

[19] Hardy does not identify what standard of error applies here, and his somewhat vague assertion that the magistrate violated his due process rights suggests an error of federal constitutional dimension. Even if the court erred in some way that affected his federal constitutional rights, we would reach this same conclusion under the federal harmless error standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

Further, Officer Rosin's testimony about Hardy's actions was well-corroborated by the surveillance video, in which an individual dressed in the distinctive pants Hardy was wearing that night can be seen hurrying into the street and apparently firing something just after a white sedan passed by him, as Officer Rosin described. Officer Rosin's testimony about Hardy's actions was also corroborated by his testimony that he immediately radioed other officers that Hardy had just fired a gun; the testimony of Officer Coleman, who was surveilling from a car on Olive Street, that he heard about six shots, heard Rosin's radio broadcast that Hardy fired at someone, and then saw Hardy and Grant walking down Olive Street; and the evidence of the spent cartridges found in the area where Rosin said Hardy had fired a gun.

Hardy does not deny the impact of this evidence. Instead, he asserts (in an argument that focuses more on the unfairness of adding count 5 on the eve of trial rather than the unfairness of his trial on count 1) that, although Rosin revealed his location at trial on direct examination and Hardy's counsel had the opportunity to cross-examine him on the subject, Hardy was prejudiced because the prosecution's failure to provide him with pre-trial discovery on Rosin's location violated his due process right not to be taken by surprise by the evidence offered against him at trial.

This argument is unpersuasive for several reasons. First, Hardy does not establish that the prosecution violated any discovery obligations or, relatedly, that the prosecution acted improperly by claiming an official privilege and then withdrawing the claim at trial. Second, Hardy's motion in limine seeking discovery sought information of Rosin's location *by the end of the prosecution's presentation of its case-in-chief*, which Hardy in effect obtained via Officer Rosin's testimony on direct. Third, Hardy *did* have

37

information about Rosin's location because Rosin testified at the preliminary hearing that he was 20 to 30 feet away in an unobstructed location when he observed Hardy.  It should have been apparent from this testimony that Rosin might have been sitting in a car, and thus the defense had notice to prepare for that possibility.  Fourth, Hardy's failure to object to Rosin's testimony on direct or seek a continuance of the trial suggests he saw no prejudice from the prosecution's late disclosure, a conclusion amply supported by Rosin's identification in the surveillance video of the car in which he was hidden, which made plain that he was well-situated to view Hardy's actions.

In short, any magistrate error was harmless under any prejudice standard and, therefore, is not a basis for reversal of Hardy's count 1 or count 5 convictions.[20]

---

[20] Hardy also refers to, but does not present separate legal argument regarding, the trial court's decision to permit amendment of the information to add count 5.  He contends there was a lack of evidence presented at the preliminary hearing to support this count, a contention he links to his claim that the magistrate erred in barring cross-examination of Officer Rosin.  To the extent he may intend to raise a separate challenge to the decision permitting amendment of the information on the eve of trial, it is unpersuasive.  "[O]ur Supreme Court has interpreted sections 739 and 1009 to ' "permit amendment of the information to add charges or enhancements which are supported by the actual evidence at the preliminary hearing, provided the facts show due notice by proof to the accused." [Citations.]' " (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1531.)  We review a trial court ruling that allows the amendment of an information for abuse of discretion. (*People v. Miralrio* (2008) 167 Cal.App.4th 448, 458.)  At the preliminary hearing, Officer Rosin indicated .380-caliber casings were found in an area of the roadway where Hardy fired a handgun six or seven times in the direction of a passing car.  As the prosecution contended at trial, these casings could have been ejected from a semi-automatic firearm.  As we have discussed, it is unclear what verdict the jury would have reached on the issue if it had been required to rely on this evidence, without reliance also on the Shotspotter evidence, at trial.  Nevertheless, prior to trial the court was within its

## III.

### *The Trial Court Did Not Err in Its Response to a Jury Question Regarding Count 1.*

Finally, Hardy argues that we must reverse his convictions on count 1 and count 5 because the trial court erred in responding to a jury question regarding count 1 and thereby lowered the prosecution's burden of proof on that count. We disagree that the court erred.

### A. The Relevant Proceedings Below

The trial court, following CALCRIM No. 965, instructed the jury on count 1 that the prosecution was required to prove, among other things, that "1. The defendant willfully and maliciously shot a firearm" and "2. The defendant shot the firearm at an occupied motor vehicle." During deliberations, the jury asked the court, "Please clarify instructions for Count One, [¶] '2. The defendant shot the firearm at an occupied motor vehicle[.]' [¶] "If the defendant intentionally fired just above or to the side of the vehicle is that *at* the vehicle[]?"

The trial court discussed how to answer this question with counsel. Defense counsel argued for a narrow response based on the instructions already given, while the prosecutor argued for an additional instruction based on case law. Ultimately, the court decided to instruct the jury based on an appellate case, *People v. White* (2014) 230 Cal.App.4th 305, 316. Over Hardy's objection, the court orally gave the jurors the following answer: " 'The offense of shooting an occupied vehicle is not limited to actually shooting at an occupied vehicle, but rather the act of shooting at a proscribed

_____

discretion to permit the amendment to add count 5 based on the probable cause standard of proof that applies in such circumstances. (See *Griffith v. Superior Court* (2011) 196 Cal.App.4th 943, 954 ["no crime . . . can be included in an information unless it has been supported by a showing of probable cause at the preliminary hearing"].)

target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more propose to strike the target for the persons in or around it.' "[21]

In giving the jury this answer, the court said, "I am not making this up. What I am doing is, I am talking the law. There is a Court of Appeal case and I am taking the sentence, the holding directly from that case so the sentence I am reading is directly from an appellate case, which is the law that I am bound by."

## B. Analysis

When the jury asks a question during deliberations, the trial court has a duty under section 1138 " 'to provide the jury with information the jury desires on points of law.' " (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882.)[22] "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. . . . But a court must do more than figuratively throw up its hands and tell the jury it cannot help. . . . It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

We review a trial court's decision whether to provide supplemental instructions in response to a question for abuse of discretion. (*People v.*

---

[21] The court gave the jury an almost identical written answer as well, which even more closely tracked the language in *People v. White*.

[22] Section 1138 states, "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court" where "the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

*Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.) We review the legal correctness of any such instruction review de novo. (*Ibid*.)

Hardy first argues that the trial court's answer to the jury's question regarding count 1 was legally erroneous because it "failed to inform the jury that they were required to make certain findings of fact, e.g., the necessary proximity [of the target] and appellant's awareness of it, before they could make an inference of conscious disregard." He further argues that this error affected the jury's evaluation of count 5, assault with a semi-automatic firearm, because that crime, like count 1's discharge of a firearm at an occupied vehicle, requires a target (in the case of count 5, a person).

This argument is unpersuasive for two reasons. First, the trial court made a correct statement of the law. " '[S]ection 246 is not limited to the act of shooting directly "at" an inhabited or occupied target. Rather the act of shooting "at" a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it.' " (*People v. White*, *supra*, 230 Cal.App.4th at p. 316, quoting *People v. Overman* (2005) 126 Cal.App.4th 1344, 1356.)

Second, Hardy's argument ignores the jury's question, "If the defendant intentionally fired just above or to the side of the vehicle is that *at* the vehicle[]?" The question necessarily assumed the requirements of intent and proximity have been met and does not inquire about them. Therefore, the court had no need to instruct the jury regarding them.

Also, Hardy, noting that our Supreme Court has cautioned about "the danger of assuming that a correct statement of substantive law will provide a sound basis for charging the jury" (*People v. Colantuono* (1994) 7 Cal.4th 206, 221, fn. 13), argues the court's statement to the jury that its supplemental

41

instruction was from an appellate case that stated "the law that I am bound by" somehow gave the jury "the impression that this new instruction took precedence over the one previously given and, erroneously conveyed that the jury's question was not relevant to their decision." We see nothing in the court's statements to the jury or in the record to support this argument. The court's supplemental instruction was a correct statement of law that did not conflict with the court's previous instruction. Further, the jury's instructions included that it "[p]ay careful attention to all these instructions and consider them together," and not conclude that any instruction was more important than any of the others if the court repeated it.

In short, Hardy's instructional error claim lacks merit.[23]

## DISPOSITION

Hardy's conviction on count 5, for assault with a semi-automatic firearm in violation of section 245, subdivision (b), is reversed. The judgment is otherwise affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion. Following *People v. Leahy* (1994) 8 Cal.4th 587, we direct the trial court to conduct a *Kelly/Frye* hearing regarding count 5 in accordance with our opinion. If, at the conclusion of the hearing, the trial court concludes there is sufficient basis to properly admit the Shotspotter evidence previously presented, the court should reinstate the judgment. If the trial court determines the evidence is insufficient to properly admit the Shotspotter evidence presented, then the court may order a new trial, if the People so elect. If the judgment is reinstated, or a new trial ordered, appellate review will be available to the parties regarding the trial court's ruling, limited to any new issues not previously resolved in this

---

[23] Given our conclusion, we have no need to discuss Hardy's contention that the court's purported error was prejudicial.

opinion.  (See *Leahy*, at pp. 612-613.)  Also, should the trial court rule there is insufficient evidence to properly admit the Shotspotter evidence presented, nothing in this opinion is intended to preclude the People from pursuing entry of a judgment of conviction on count 5 for a lesser included offense, including on the accompanying enhancement, instead of retrying that count, under *People v. Kelly* (1992) 1 Cal.4th 495, 528, if supported by law and the record in this case.

 

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*People v. Hardy* (A158179)

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Thomas C. Rogers

Counsel:

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.